[PHILADELPHIA, FEBRUARY 16TH, 1839.]

## SAILOR *against* HERTZOG and Others.

1. Where A. conveyed a messuage and lot of ground to B., on the 7th of June, 1788, and on the 5th of July, 1788, B. conveyed to C. by deed, which was recorded on the 27th of May, 1789, and on the 19th of January, 1789, B. reconveyed the same premises to A. by deed, which was recorded on the 24th of November, 1789, it was *held*, that under the recording acts the deed to C. was void as against A. and those claiming under him.

2. The law presumes that a purchaser of real estate will not trust merely to the title papers and records, but will inquire of the person in possession whether he claims title to the land : If the possession is distinct and unequivocal, it is sufficient to put the purchaser on inquiry, and amounts to constructive notice.

3. Where an assignment under the insolvent law was made on the 24th of June, 1817, and the assignor brought an action of ejectment to December term 1831, which was tried on the 11th of December, 1836, it was *held*, that the jury might presume that the debts of the plaintiff had been paid.

4. To prevent the running of the statute of limitations, a parol acknowledgment of the adverse title by the person in possession, must be such as to show that he intends to hold the possession no longer adversely, but in future under the party making the claim of right to the land against him, and such as to induce the latter to believe that he will so hold it. Declarations made with a view to a compromise or arrangement of the dispute, are not sufficient.

THIS was an action of ejectment brought by Henry Sailor against Peter Hertzog, George S. Geyer and Edward Ducray, to recover possession of a messuage and lot of ground situate on the east side of Sterling alley, in the city of Philadelphia, containing in front thirty-four feet six inches, and in depth forty-seven feet.

On the trial before Mr. Justice ROGERS, at a Court of Nisi Prius held in Philadelphia, on the 11th of December, 1836, it appeared that the plaintiff claimed title under one William Henderson, who, it was admitted, was at one time the owner of the property; and to maintain the issue on his part the plaintiff gave in evidence an exemplification of a deed from William Henderson and wife to George Weiss, dated the 7th of June, 1788, acknowledged on the 10th, and recorded on the 11th of the same month, for the premises in question, for the consideration of £500 ; an exemplification of a deed from George Weiss to Jacob Sailor, dated the 5th of July, 1788, acknow-

(Sailor *v.* Hertzog.)

ledged on the 12th of January, 1789, and recorded on the 27th of May following, for the premises, for the consideration of £500, and a deed from Jacob Sailor with Elizabeth his wife to Henry Sailor, dated the 12th of August, 1817, acknowledged and recorded on the same day, whereby the grantor in consideration of ten dollars, conveyed all his real estate to the grantee, his heirs and assigns, in trust for himself and his wife, for their joint lives, and the life of the survivor, with remainder to his children in fee.

Parol evidence was then given on the part of the plaintiff, in substance as follows.

Catharine Craigen, a sister of Jacob Sailor, testified that her husband received rent for the property, and remitted it to Jacob Sailor, who then lived in the western country. It was two or three years before 1792, that her husband began to collect the rent, and it was in 1797 that he last received it. About 1798 they found strangers in possession. In 1815, Jacob Sailor gave a power of attorney to Isaac Young, her son-in-law to look after the property, and in the course of that year she went with her to the residence of a Mr. Ley, who was in possession of the premises, and who acknowledged the title of Sailor, and offered to buy his right.

Isaac Young testified, that in 1815 Jacob Sailor gave him a power of attorney, in pursuance of which he called on Daniel Ley, produced the power, and a copy (which he had obtained from the recorder's office,) of the deed of Weiss to Sailor. Ley admitted the validity of Sailor's title, said that he had not paid the whole of the purchase-money to Peterman, from whom he purchased, and was willing to compromise. He requested the witness to send Sailor to him. In the month of December, 1815, the parties met at a tavern, when Ley offered Sailor a certain sum for the property, which Sailor declined.

Henry Kalback testified, that about twenty years previously, he called at the premises with Sailor, who produced his deeds to Ley, and said the property belonged to him. Ley said that he had bought the property of another. About two years afterwards, they called on Ley again, who admitted that Sailor's title was the best, and offered him a certain sum for a conveyance. Sailor asked a higher price. Several other interviews took place, in which Ley admitted the opposite title, and offered money.

The plaintiff here closed his case, and the defendants gave in evidence the following deeds and other documents.

1st. The original of the deed of Henderson to Weiss, of which the plaintiff gave in evidence the official copy.

(Sailor *v.* Hertzog.)

2nd. 19th January, 1789. George Weiss and wife to William Henderson, for a messuage and lot of ground, thirty-four and a half feet by forty-seven feet—the consideration being a reassignment of certain bonds, and five shillings in money. This deed was recorded on the 24th of November, 1789.

3rd. 2nd February, 1789. William Henderson and wife to Jacob Ettwein, for a messuage and lot of ground fifty-eight and a half feet by forty-seven feet: recorded on the 24th of November, 1789.

4th. 16th February, 1789. Jacob Ettwein and wife to John Peters, for the same premises, recorded 14th December, 1789.

5th. 28th November, 1791. Will of John Peters, whereby he empowered his executors to sell his real estate.

6th. 15th April, 1800. The executors of John Peters to Joseph Peters, for the same premises. This deed was acknowledged on the 5th of May, 1804, and recorded on the 18th of October, 1804.

7th. 29th November, 1809. Joseph Peters to Daniel Ley, for the same premises: recorded 18th April, 1816.

8th. 3rd February, 1818. Daniel Ley to Thomas Reeves and others, being a general assignment of his property for the benefit of creditors.

9th. 26th June, 1818. Thomas Reeves and others to Peter Hertzog and Tobias Beehler, for the premises: recorded 22d April, 1819.

10th. 28th May, 1822. Tobias Beehler and wife to Peter Hertzog, for his moiety of the premises.

11th. 1st August, 1827. Peter Hertzog to George S. Geyer, for the premises.

12th. 29th November, 1809. Mortgage by Daniel Ley to Joseph Peters of the premises to secure payment of $1688 88 : satisfaction entered 21st January, 1825.

13th. 18th April, 1816. Mortgage Daniel Ley to Thomas S. Field and John Snyder, guardians, to secure payment of $1600. Satisfaction entered on the 2nd of July, 1818.

The defendants then went into parol evidence.

John Patterson testified, that Ley & Hupfeldt occupied the premises as sugar refiners in 1802 and 3, and that he purchased occasionally of them from that time to 1817, when the witness left the city, and that on his return in 1822 he found Peter Hertzog in possession.

Conrad Wile testified that he had known the property fifty years. The first persons he knew to be in possession were the Peters' family

in 1793. After that a man named Stammers occupied it and continued there until 1798, when the witness removed from the neighbourhood. This witness produced the assessment books of the city of Philadelphia, from which it appeared, that from the years 1791 to 1797, inclusive, the property was assessed in the name of Jacob Peters; from 1798 to 1801, inclusive, in the name of George Peters's estate; in 1802, 3 and 4, in the name of Daniel Ley, for George Peters's estate; and from 1805 to 1811, in the names of Ley & Hupfeldt.

Lewis Eppelsheimer testified, that he knew one Jacob Sailor, and first knew him about 1806 or 7, and supposed him to be about the same age with himself, the witness then being past seventy. That this Sailor told him that he took the benefit of the insolvent law about 1808.

John Greiner testified, that he had known the property more than fifty years. The first person he recollected in possession was John Moore. Then John Peters. Jacob Peters his son succeeded him. Then Daniel Ley. Jacob Peters was in possession in 1793, and died in the fever of that year. After his death the witness thought that the building was shut up for some time. The boys pelted it with stones as a haunted house.

Edward Penington testified, that Daniel Ley went into the sugar house in Sterling alley, about 1800 or 1801, and was in business there seven, eight, or nine years.

John Maybin testified, that the Peters family were in possession of the property in the year 1793, and it remained in their possession until it was sold by the executors of John Peters at public sale. The witness was one of the executors, and never heard of Sailor, or of his claim until recently.

The defendants also gave in evidence the depositions of Isaac Young and Catharine Craigen, taken on a trial before arbitrators, for the purpose of contradicting their testimony on this trial; and also produced the petition of Jacob Sailor for the benefit of the insolvent laws in 1807.

Evidence was also given with the view of discrediting the testimony of Henry Kalback.

Frederick Beates, a scrivener, testified that he drew the deed from the executors of John Peters to Joseph Peters, and that from Joseph Peters to Daniel Ley; that he had the chain of title down to Joseph Peters. He was not in the practice of searching for conveyances where there was a chain of title; but searched for mortgages and judgments.

(Sailor v. Hertzog.)

The plaintiff then gave rebutting testimony to show that the Jacob Sailor who applied for the benefit of the insolvent laws in 1817, was not the plaintiff in this suit, but a nephew who bore the same name.

The judge charged the jury in substance as follows.

" This is an action of ejectment to recover the possession of a sugar-house, formerly a bake-house, with a lot, being part of a larger lot, in breadth 34½ feet, and in depth 47 feet, situate in Sterling Alley, between Sassafras and Cherry streets. The plaintiff claims under William Henderson, who they admit was the rightful owner of the property in dispute. The plaintiff who must recover, by the strength of his own title, and not by the weakness of his adversary, deduces his title in the following manner. On the 7th June, 1788, William Henderson conveys the property by deed to George Weiss, for the consideration of £500. This deed was acknowledged on the 10th June, 1788, and was duly recorded on the 11th June, 1788. On the 5th July, 1788, George Weiss conveys the property to Jacob Sailor for the same consideration, viz. £500. This deed was recorded on the 27th May, 1789, acknowledged 12th Jan. 1789. And on the 12th August, 1817, Jacob Sailor and wife, for certain purposes therein mentioned, and for the consideration of ten dollars, conveyed the property to the plaintiff, Henry Sailor. This deed was acknowledged and recorded the same day, viz. 12th Aug. 1817. This vests a complete title in the plaintiff, unless the defendants protect themselves by some of the various grounds of defence which they have taken.

The defendants have presented their case to you under four different aspects.

1. They contend that the plaintiff cannot recover, because of fraud.

2. Because George Weiss re-conveyed the property to William Henderson, and Henderson conveyed to Ettwein before the deed made by Weiss to Jacob Sailor was recorded.

3. Because Jacob Sailor took the benefit of the law for the relief of insolvents, before he conveyed the property to the plaintiff, Henry Sailor.

And 4th. They contend that they are protected by the statute of limitation.

These points, it is believed, will embrace the whole case; and I will now proceed to consider each in their order.

And first, as to the alleged fraud.

The defendants contend, that there was fraud in the deed from William Henderson, of the 7th June, 1788, of which Jacob Sailor had notice. And if this be so, the plaintiff cannot recover. But of this the defendants should furnish some proof, for fraud is not presumed. There must be something more than mere assertion.

(Sailor *v*. Hertzog.)

The defendants must not only prove that George Weiss defrauded William Henderson, but they must likewise show, that Jacob Sailor participated in the fraud, or that he was aware of the fraud, before he purchased from George Weiss. An innocent purchaser of the legal title, without notice of trust or fraud, is peculiarly protected in equity, and a Court of Chancery will not lend its aid to enforce a claim for the land against him. For although the sale may be fraudulent and void, as respects the purchaser because of his having been a party to the fraud, yet, as to a subsequent and innocent purchaser from him, the title will be good. But you will inquire, whether there is any evidence from which you can infer fraud, as between the original parties, William Henderson and George Weiss. But the defendants must not only satisfy you that there was the fraud, with which they charge George Weiss, (of which I cannot perceive any proof,) but they must also show that Jacob Sailor either participated in the fraud, or that he had notice of the fraud before the 5th July, 1788, when George Weiss conveyed him the property. They also contend, that there was fraud in the deed from George Weiss to Jacob Sailor. For proof of this charge, they rely on the fact that Weiss's wife did not execute the deed, and because Sailor has not produced the original deed, but a copy; and because Sailor neglected to put his deed on record, until May, 1789. That the presumption is the deed was cancelled. Although, you are the undoubted judges of the facts of the cause, I think it my duty to say, that in the opinion of the Court, there is not such proof of fraud, as would justify a finding for the defendant on this ground. Fraud should not be shown by inference merely, but there should be positive proof of fraud; or such circumstances should be shown as usually accompany fraud.

2d. The defendants say the plaintiff cannot recover, because George Weiss re-conveyed the property to William Henderson, and Henderson made a deed to Ettwein before Jacob Sailor's deed was recorded. In order to understand this point, you must recollect that George Weiss re-conveyed the property to William Henderson on the 19th January, 1789, and Henderson conveyed to Ettwein on the 2d February, 1789; that the deed of George Weiss to Jacob Sailor, was dated the 5th July, 1788, and was not recorded until the 29th May, 1789, nine months after its date, and eight months after Ettwein's deed, and after the re-conveyance from Weiss to Henderson. Now the defendants contend, that they stand in the situation of a *bona-fide* purchaser without notice of the plaintiff's title. And if they do, it shows such an outstanding title in the defendants, as is sufficient to defeat the plaintiff's claim. The acts of assembly, make it necessary for a person to have his deed recorded within six months, otherwise it is void against a subsequent purchaser, *bona fide*, without notice, under the same title. That is to say, if a man takes a deed for a piece of property, and does nothing more, a

(Sailor *v.* Hertzog.)

person who purchases the property from the original owner, without any notice of the prior sale, acquires a good title. But if he has notice, he acquires no title, although the other neglects to put his deed on record. If, therefore, William Henderson, on the 19th January, 1789, and Ettwein, on the 2d February, 1789, had notice of the sale made by Weiss to Sailor, of the 5th July, 1788, they acquired no title as against Sailor, on account of his failure to record his deed. Notice, is of two kinds.—1. Actual, and 2. Constructive notice. It will be your province to inquire, under the direction of the Court, whether Henderson and Ettwein had either actual or constructive notice. Had they actual notice, that is to say, did Henderson and Ettwein know, at the respective time when they purchased, that George Weiss had sold the property previously to Jacob Sailor? The defendants charged George Weiss and Jacob Sailor with a combination to defraud Henderson,—and it will be for you to say, whether there is not at least as much evidence to show that it was the intention of Henderson and Weiss to defraud Sailor. It is for you to determine from the evidence, on which I would not wish to be understood as expressing an opinion, whether Henderson and Ettwein knew that Weiss had conveyed all his interest in the premises previously to Sailor. The plaintiff contends that it is sufficient that the deed from Weiss to Sailor, was recorded viz. on the 27th May, 1789, before the deed from Henderson to Ettewin was recorded viz. 24th November, 1789.. The Court instructs you, that the law is not as the plaintiff's counsel contend.. It is the desire of the Court to take the opinion of the jury on the fact. The point will be reserved, and, if necessary, will be determined by the Supreme Court. The question is, as above stated, whether Henderson had notice of the deed from Weiss to Sailor, on the 19th January, 1789, and whether Ettwein had notice on the 2d February, 1789. The plaintiff further contends, that the recording act of 1775, does not make void an unrecorded deed, as against a subsequent purchaser, under a title totally unconnected with that deed, but only as against a purchaser under the same title. And this, is undoubtedly the law. But do the defendants claim under a title totally unconnected with the deed, under which the plaintiff claims. The Court instructs you, that they do not. Both parties claim under the same title. And if Henderson re-purchased the property of Weiss, or Ettwein purchased without notice of Sailor's title, it divests the property of Sailor, and the plaintiff cannot recover. This point is also ruled, with a view to the facts. The point ruled will also be reserved, and the Supreme Court will decide. The next inquiry will be, if Henderson had not actual notice, had he what in law is called constructive notice. And if he had constructive notice, it is as effectual as if he had actual notice. There are certain things that the law presumes every purchaser of real estate to know. For instance, a person is presumed to know of the existence of a deed which has been recorded. This is the very

object of the recording act. And whether in point of fact he knows it or not, is no manner of consequence. He might have known it, if he had chosen to inquire. So also if a person purchases an estate, and takes possession, although he does not record his deed, yet this is constructive notice to a subsequent purchaser. The law presumes, that a purchaser will not trust merely to the title papers, or to the records, but that he will inquire of the person in possession, whether he claims title to the land. Thus it has been held, that when the owner of a lot of land, containing about twenty acres, conveyed one acre of meadow-land to A., who neglected to record his deed, but took possession, and planted it with willows, for the purpose of his trade of basket-making, which willows he cut every year, at the proper season, and he continued in his possession about fourteen years, when the land of the vendor was sold at sheriff's sale, it was held that the possession of A. was sufficiently distinct and unequivocal to give notice to the purchaser at the sheriff's sale. The possession was held to be sufficiently distinct, to put the purchaser on inquiry, as to the right under which the possessor held the land. It is therefore a principle of law, that such a possession as is sufficient to put a purchaser on inquiry, is constructive notice. You will then inquire whether Jacob Sailor, either by himself or tenants, was in the actual possession of the premises on the 19th January, 1789, or 2d February, 1789. It will be remembered by you, in this part of the case, that ten months previously to this time, viz. 5th July, 1788, Jacob Sailor purchased this property from George Weiss for the sum of five hundred pounds. At this distance of time, and in the absence of all proof to the contrary, the jury are warranted in presuming that Jacob Sailor took the actual possession of the property according to contract, and that he held the property in the possession of himself or tenants, until the 19th January, 1789, and until the 2d of February, 1789. This presumption, connected with the testimony of Catharine Craigen, (if you should credit her testimony,) that Jacob Sailor took possession immediately, and offered to let her live there, that her husband received and transmitted the rents of this property in or about the year 1793, will be sufficient evidence of that possession which the law requires. It was, under the circumstances of this case, sufficient to put him on inquiry, which is all the law requires. If, therefore, you should believe that Henderson, on the 19th January, 1789, and Ettwein, on the 2d February, 1789, had either actual or constructive notice of the sale to Sailor, there is an end of this part of the case.

3rd point. That Jacob Sailor took the benefit of the act for the relief of insolvent debtors, before he conveyed the property to the plaintiff, Henry Sailor. The jury will remember that Henry Sailor, the plaintiff, derives title from his father, Jacob, by a deed dated the 12th August, 1817. Previous to this date, viz. on the 24th June, 1817, Jacob Sailor was discharged as an insolvent debtor, and

(Sailor *v.* Hertzog.)

assigned all his property to certain trustees therein named, for the benefit of his creditors. It is a principle of law, that the plaintiff must recover by the strength of his own title. And for this reason the defendants contend that, having before conveyed his property to trustees, for the benefit of his creditors, the plaintiff's title is defective, and that he cannot recover in this action. The law is this. An insolvent debtor who has made a general assignment of his property, cannot maintain suit when the cause of action accrued previously to the assignment. Nor can a person, discharged as an insolvent debtor, after assigning all his property to trustees, support an ejectment for land, though his trustees have not given bond. If, then, this case rested here, it would defeat the plaintiff's title, and your verdict should be in favour of the defendants. But the plaintiff contends, 1. That this is not the Jacob Sailor from whom the plaintiff claims title, but his nephew. 2. That if it is, yet the presumption is, that the debts have been paid, and the property is his, or his vendee's. Whether this is Jacob Sailor, the purchaser of this property, or his nephew, is a question of fact for you to determine. The record was admitted on the testimony of a witness, Epplesheimer, who said that he had seen Jacob Sailor write, and that he believed it was his hand-writing. Isaac Young, however, thinks it is not his hand-writing, but is the hand-writing of Jacob, the nephew, who, as Mrs. Craigen says, took the benefit of the act. The witnesses never said that old Jacob did take the benefit of the act. Several arguments have been brought to bear on this part of the case, which no doubt you distinctly remember, and which it will be needless for me to repeat. You will determine, for yourselves, whether this is the same Jacob Sailor from whom the plaintiff claims title. Next, the plaintiff says, that even admitting that it is the same person, yet that the debt has been paid, and the plaintiff is entitled to recover, notwithstanding the assignment. The law is this: If the debts of the insolvent have been paid, the plaintiff may recover. For there is no necessity of a formal reassignment of the property. A debtor has a resulting interest in the property, that is, all that remains, after paying debts, belongs to him. If, then, the debts are paid, the trustees are seized of the legal title in trust for him; and he, or his vendee, can maintain ejectment. It is a principle in the law of Pennsylvania, arising from our want of a Court of Chancery, that a plaintiff may maintain an ejectment on an equitable title, and cannot be nonsuited for a title outstanding in his own trustee. It will be your duty to inquire whether the debts have been paid. And here let me remark, that the plaintiff is entitled to the presumption that they have been paid. The assignment was made the 24th of June, 1817. The suit was brought to December term, 1831, and the cause is now trying, on the 11th of December, 1836. To the commencement of the suit is upwards of fourteen years, and until this time, it is upwards of nineteen years. The presumption, therefore,

(Sailor *v.* Hertzog.)

is, that these debts have been paid, or that some satisfactory arrangement has been made in respect to them, either by Jacob Sailor, or by the plaintiff, Henry Sailor, who has an interest in extinguishing the lien against the estate. The doctrine of presumption arising from lapse of time, is not only a very extensive, but it is a very salutary principle of law. When judiciously applied, it may prevent a great deal of injustice by stifling stale complaints. The part that the trustees have done in this, perhaps, adds to the presumption, because it is difficult to account for the acquiescence or forbearance of the creditors, except from the presumption that the debts have been paid, or that some arrangement has been made mutually satisfactory, by them with the owner of the resulting interest. But this presumption may be rebutted; and if you should be of the opinion, notwithstanding, from the evidence, that the debts have not been paid, it removes the plaintiff's objection, so far as this matter is involved. On this branch of the case you will inquire, 1. Whether this is the Jacob Sailor from whom the plaintiff claims title; and 2. Whether the debts have been paid. If you find either that it is not the same person, or that the debts have been paid, there is an end of this part of the defendant's defence. But if you should be of the opinion that it is the same person, and that the debts have not been paid, it is a bar to the plaintiff's action. This question is based on the supposition that the defendants have no title. It is a plank in a shipwreck, of which they have a right to avail themselves, although I do not think it a point which deserves any extraordinary favour from the jury. But of this part of the case, as of every other, you will judge. The fourth, and last point, is on the act of limitation. The defendants rely on that section of the act of the 28th of March, 1785, which declares that no persons shall make entry into any manors, lands, tenements, or hereditaments, after the expiration of twenty-one years after his, her, or their right or title to the same first descended or accrued. The defendants assert that they are protected by that statute; that they entered under colour of title; and that they, and persons from whom they derive title, have held the adverse possession for fifty years. The defendants deduce their title from William Henderson. William Henderson conveyed the premises to George Weiss, 7th of June, 1788. George Weiss reconveyed to William Henderson on the 19th of January, 1789. But before this, on the 5th of July, 1788, George Weiss had conveyed to Jacob Sailor, so that Weiss had nothing to reconvey. Henderson conveyed the property, by two deeds, to J. Shaeffer and Jacob Ettwein. Ettwein conveyed to John Peters. John Peters makes his will on the 28th of November, 1791; and, as the defendants say, which, by-the-by, the plaintiffs deny, authorises his executors to sell this, among other property. I will remark here, that I do not consider this a very material question in this case, nor shall I express any opinion upon it. If the defendants were plaintiffs, it might be of

(Sailor *v.* Hertzog.)

some importance. Be this as it may, the executors convey to Joseph Peters. Joseph Peters, on the 29th of November, 1809, conveys to Daniel Ley. Daniel Ley conveys to Thomas Reeves and others, his assignees. The assignees convey to Peter Hertzog and Tobias Beehler. Tobias Beehler and wife to Peter Hertzog. And Peter Hertzog to George S. Geyer. The defendants allege that they, and the persons from whom they claim, entered into the possession of the premises in pursuance ,of the title as above recited; and that they remained in the undisturbed possession for more than twenty-one years. And this question is a most important point in this cause, which you will decide from the evidence, under certain directions, to which I request your particular attention. Adverse possession must be taken strictly, and cannot be made out by inference, but must be made to appear by clear, if not positive, yet strong proof. Every presumption is in favour of possession, in subordination to the title of the true owner. The entry of the owner of land is only barred by an actual, continued, notorious, visible, distinct and hostile possession of twenty-one years. It is not necessary to entitle him to recover in ejectment, that he should prove that he, or those under whom he claims, have been in possession within twenty-one years. You will perceive, that a person may be out of possession for more than twenty-one years, and not lose the title to his land. To defeat him, it is necessary for the possessors of the land to prove, distinctly and clearly, all the requisites which I have just now enumerated. They must prove an actual, continued, notorious, visible, distinct, and hostile possession of twenty-one years. In considering this part of the case, you are to take with you, that the plaintiff had the legal title to this land. That the defendants, or those under whom they claim, entered with the actual or constructive notice of this title, and that they now seek to protect themselves by an adverse possession, with the aid only of what the law denominates a colourable title. You perceive, therefore, that if a person desires to oust the legal owner of land by an adverse holding, he must be vigilant, and must not leave this to inference merely. He must produce the testimony necessary to make out his case. It is not for him to complain that the plaintiffs have delayed to enforce their claim. The whole burthen of proof lies on the defendants. If they fail in any one of the requisites which I have enumerated—if a single link is wanting in the chain, there is an end of the defence on the act of limitation. You perceive that the law has fenced and guarded the rights of the owner of real property. These rules we are not at liberty to depart from, even if we had the inclination. They are founded in the wisdom of ages, and the more they are examined, the more they will be admired. They are the bulwarks of our rights of property. Let me here make some general remarks, which you may find useful in examining this part of the cause. Small discrepancies or errors in the recollection of witnesses, examined at different times, are entitled

to but little weight in discrediting them, if in material points, they are entitled to more, although not by any means conclusive. Indeed, if a person always told the same story, in precisely the same way, that would in some cases of itself be a suspicious circumstance. If, however, a person swears wilfully false, in one particular, you may and ought to disbelieve him altogether. It is also a rule founded on principles of common humanity and justice, that perjury should not be imputed to a witness or witnesses on slight grounds; and when they are in apparent contradiction, it is your duty to reconcile their testimonies, if you can consistently with the evidence. So, if the general character of a witness for truth and veracity is impeached, yet if he is supported by other witnesses, substantially, you would not be justified in disbelieving him on that account, in testifying to a transaction in which he is entirely without interest. Nor, are you lightly to believe in a combination of witnesses for this purpose. These observations apply particularly to the witnesses for the plaintiff, Catharine Craigen, Isaac Young, and Henry Kalback, and there will be no difficulty in making the application. The defendants contend, that John Peters, who had at least a colourable title to the property, having a deed for it from Jacob Ettwein, dated 2d February, 1789, entered on the possession of the property some time about the year 1793. That they, the Peters, and the persons who held under them, have continued to hold the adverse possession of the same, from that time until the present, without interruption. For this purpose, they have examined a variety of witnesses, and the question will be whether they have succeeded, of which you will judge, in showing an actual, visible, notorious, distinct, and hostile possession of twenty-one years. I must here remark, that if they show such a possession as is just described, from the year 1793 until the year 1815, the time when, as the witnesses for the plaintiff state, Ley acknowledged the title of Sailor, that will be more than twenty-one years, and therefore sufficient. The defendant's title will then have been complete, and the subsequent acknowledgement of Ley will not affect them. The defendants have examined a variety of witnesses, who prove, as they say:—That John Peters, under whom they claim, took possession of the property in 1793, and that it was held by them until at least 1815, and even until the present time. But here the plaintiff meets them on the threshold, and denies that Peters ever entered into the possession of the property at all. That they were in possession of the adjoining property, but not of this, and if they were, it does not distinctly appear for what purpose they took possession. And this entry must be taken to be in strict subordination to the rightful owner. In this way the plaintiff seeks to rid himself of the alleged entry of John Peters. The plaintiffs say, it does not distinctly appear for what purpose they took possession. But to this the defendants reply, that Peters had at least a colourable title to the property, and that the presumption is, that Peters

(Sailor *v.* Hertzog.)

entered in pursuance of this right. This is a presumption to which I think the defendants are fairly entitled. But it will be for you, notwithstanding this presumption, to say, whether they, entered into possession, and whether that possession was in its commencement a hostile or adverse possession. If not hostile or adverse, then the defendants must show when it assumed that character. But it is not only necessary that the possession must be adverse in its commencement, it must be a continued possession. If the possession is interrupted, its continuity is destroyed, and this prevents the running of the act. It is not necessary that the same person should be in possession, but if the possession be continued by descent from father to son, or by successive sales, that is sufficient. But if a trespasser, that is, a person who is not connected with the previous owner, gets possession, it is not a continued possession, and the act of limitation will not protect the defendant. The defendants contend that they have furnished such proof; this the plaintiff denies. He contends that the defendants' testimony does not prove either that it was originally his title, or if so, that it did so continue. It will be for you, to say, whether the defendant's testimony furnishes that clear and positive proof of these facts which the law requires. And further they rely on the testimony of Catharine Craigen, Isaac Young and Henry Kalback. Catharine Craigen says, that her husband, Frederick Gash, received rent for Jacob Sailor, and sent it into the country to him. The last year was before 1798. She says her husband, herself, and two others, went together to receive the rent. She knows he received it, put it in a letter, sealed and sent it up the country. She thinks he received the rent for two or three years before this. To her testimony, the defendants oppose the evidence of Mr. Maybin and others, who the plaintiff says is an interested witness, and denies the accuracy of his statement. On this part of the case, I will barely remark, that I cannot perceive very well how Mrs. Craigen could be mistaken, except wilfully so, in a matter of so much importance in this cause. Whether she is mistaken, will be for you to determine, remembering always that perjury should not be lightly imputed to her, and that it is your duty to reconcile the testimony of the witnesses, if it can be conveniently done. If, however, you believe her testimony, here then is an interruption of the possession, which continued, according to her, until some time about the year 1800. Her evidence shows that the persons in possession, instead of being the tenants of Peters, were in truth the tenants of Sailor, the rightful owner of the property. They have also relied on the assessment. This testimony is not entitled to much weight. It was never in the name of John Peters. It does not appear that the taxes were paid by them. I do not wish to be understood as intimating any opinion on this part of the case. You, gentlemen, have heard the evidence and the arguments of counsel, and you will judge. If, then, the possession was interrupted, it

(Sailor *v.* Hertzog.)

cannot again begin to run until, say 1799, 1800, or 1802, and it is immaterial which.　For until 1815, which is another period which is important in the cause, twenty-one' years will not have elapsed. On this point it is necessary also to remark, that several of the witnesses speak of the premises having been vacant for some time about this period.　Mr. Greiner says, it was called the haunted house, was vacant and pelted with pebbles.　In order to destroy the continuity of possession, the vacancy must not be merely occasional, such as occurs in every case, where a party, from some cause, is unable to obtain a tenant, and shuts his property up for a short, or indeed a long time.　But when the possession is abandoned for any time, or when any person obtains the possession who is unconnected with the previous holder, it prevents the operation of the act of limitation against the owner.　When the possession is vacant, the law casts the possession on the legal owner.　The plaintiff also contends, that there is no evidence to show when, or how, Daniel Ley came into possession: that he makes a breach in the possession: that inasmuch as this is not shown, the presumption is, that he entered in strict subordination to the title of the rightful owner.　That this view is confirmed by the fact, to which I shall afterwards draw your attention, that Ley acknowledged the title of Sailor.　To this, the defendants reply, that Mr. Maybin proves that Daniel Ley come into possession of the property as the tenant of Peters.　The plaintiff also says, that there was an assertion of title by Sailor in the year 1807.　This depends on the testimony of Henry Kalback.　I shall now call your attention to the year 1815; to the transaction which is spoken of as having taken place in that year.　I refer now to the testimony of Catharine Craigen, Isaac Young, and Henry Kalbach.　In considering this part of the case, I would wish you to remember what has been already said to you.　The credit to be given to these witnesses is entirely for you—you will determine this from a view of the whole case.　But if they are to be believed, and they substantially concur in the same statement, they distinctly prove, that in the latter year, 1815, Isaac Young, acting under a letter of attorney from Jacob Sailor, claimed the title to this property.　That Daniel Ley, who was then in possession, having obtained a deed from Joseph Peters, most distinctly and unequivocally admitted the title of Jacob Sailor.　That he promises either to rent or purchase the property; and they had more than one interview for this purpose.　But they were unable to compromise, in consequence of Ley's unwillingness to give the sum demanded by Sailor.　Although a compromise offered and not accepted, is of no weight, nor would the protection of the statute be lost by declarations, that if the adverse right is asserted and proves the best, he must yield, as is said by Justice HUSTON, in *Jones* v. *Porter,* (3 *P. R.* 135,) yet if you should believe that Daniel Ley acknowledged the plaintiff's title, and promised either to rent or purchase, the defendants lose the privilege of the statute, unless the

defendants had an actual possession previous to this time, of more than twenty-one years. From 1815 until 12th December, 1831, is a period of only 16 years, and this would not be sufficient time to bar the plaintiff's right. You will not fail to observe, that to bar the plaintiff's right it is necessary that there must be a continued possession. It will not do to make up the twenty-one years by detached periods of time. You cannot take ten years, then five, and put these together, so as to made up the twenty-one years. If there is an interruption in the adverse holding for any period of time, however short, the defendants must begin again, and must count their adverse holding from the time interruption ceased.

In conclusion, I have only to say to you that the plaintiff is entitled to recover, unless the defendants have shown either fraud, or that Weiss re-conveyed the property to Henderson, or Henderson conveyed to Ettwein before the deed made by Weiss to Sailor, was recorded, without notice either express or implied, or that he is protected by the assignment to his assignees, or by the act of limitation.

If, however, you should think that the defendants have succeeded in either ground of defence, your verdict will be for the defendants.

If otherwise you will find for the plaintiff."

The jury found for the plaintiff; and the defendants moved for a new trial upon the following reasons.

"1. Because the verdict is against law, inasmuch as the deed from Weiss to Sailor of the 5th July, 1788, was not recorded until more than nine months after its execution, that is, not until 27th May, 1789, and not until after the execution and acknowledgment of the deeds of Weiss to Henderson of 19th January, 1789, of Henderson to Ettwein of 2d February, 1789, and of Ettwein to Peters of 16th February, 1789; they, the said Henderson, Ettwein, and Peters, being, as alleged and proved on the part of the defendants, subsequent *bona-fide* purchasers for a valuable consideration and without notice. And also,

2. Because the claim of the plaintiff is barred by the statute of limitations; the defendants, and those under whom they claim, having actual, distinct, notorious, visible, hostile, and uninterrupted adverse possesion of the premises in question previous to and from the year 1793, till the year 1815, at least, and as the defendants allege, previous to and from the year 1793, till the present time, accompanied by the title papers from 1750, and with the evidence of the assessment books from the year 1791. And also,

3. Because the defendants, and those under whom they claim, had adverse possession of the premises in question for more than twenty-one years. And also,

4. Because Jacob Sailor, the grantor to the plaintiff, had assigned his property to trustees, under the insolvent laws of Pennsylvania, in

(Sailor *v.* Hertzog.)

June, 1817; and in the month of August following, made the conveyance to the plaintiff, in trust for himself, (the said grantor and others;) and therefore he the said plaintiff, cannot maintain this action.

5. Because the verdict is against the evidence in the cause, inasmuch as the only proof of possession of the said Jacob Sailor, prior to 1815, was that of Catharine Craigen, (except Henry Kalback, who besides being discredited, spoke only of the year 1807, about nine years before Daniel Ley was the owner of the premises, and he merely spoke of an application to Daniel Ley, who was then in possession,) and there were several disinterested, credible and intelligent witnesses, on the part of the defendant, who proved the possession of the defendants, and those under whom they claim, previous to, and from the year 1793, till the present time, and that the possession was adverse; besides the public sales of the property, and other acts of those under whom the defendants claim, evidenced by deeds and other documents.

6. Because the property was twice sold by public sale, and no notice or caution given by the plaintiff or Jacob Sailor.

7. Because the judge who tried the cause, erred in charging *the jury, that the law presumes the purchaser is bound to inquire of the* person in possession about the land; *and that the jury were* warranted, nay bound to presume that Jacob Sailor had possession till 19th January, and 2d February, 1789.

8. Because the judge who tried the cause, erred in telling the jury that in considering the point of the statute of limitations, they were to consider that Jacob Sailor had the legal title, and also that it is not for the defendants to complain that he laid by; without telling the jury that that was a circumstance to be taken into consideration against the plaintiff's title.

9. Because the judge who tried the cause, charged the jury that the parol evidence, respecting the acknowledgment by Daniel Ley, of Jacob Sailor's title in 1815, if believed, was sufficient to take the case out of the statute of limitations, and to prevent its being a bar to the plaintiff's recovery.

10. Because the judge who tried the cause, told the jury that the plaintiff was entitled to the benefit of the presumption that the debts of Jacob Sailor were paid, or that some satisfactory arrangement had been made respecting them.

11. Because the verdict is against law and evidence."

The case was first argued at March term, 1837.

Mr. *Keemlé,* for the defendants.

1. The deed from Weiss to Sailor was not recorded until after the

(Sailor v. Hertzog.)

deeds to Henderson, Ettwein and Peters; who were *bona fide* purchasers without notice. The act of 1775 declares, that every deed which shall not be proved and recorded within six months from the execution shall be void against any subsequent purchaser, unless such deed be recorded before the proving and recording of the deed or conveyance under which such subsequent purchaser shall claim. In this case it is not pretended, that either Henderson, Ettwein, or Peters, had actual notice of Sailor's claim, and there can be no constructive notice under this act of assembly.

2. The judge erred in telling the jury that they were warranted in presuming that Sailor had possession until January or February, 1789, and that the purchaser was bound to inquire of the person in possession about the land. There was no evidence whatever of Sailor having been in possession. 2 *Starkie's Evid.* 506. [ROGERS, J.—Possession is presumed to follow the recording of the deed, and the contrary must be shown.] It has not been supposed that a purchaser who has a regular chain of title, with all the previous deeds, is bound to go to the property and inquire into the ownership of the person in possession. [KENNEDY, J.—I think that *Krider* v. *Lafferty*, (1 *Wharton's Rep.* 303,) settles that point against you.]

3. Parol evidence of an acknowledgment of title in another is not sufficient to prevent the operation of the statute of limitations. How could a purchaser from Ley become acquainted with these alleged conversations. The statute of frauds and the statute of limitations would both become nugatory, if such evidence were allowed any weight. The conversation was not evidence of any *fact;* at best, it was a mere expression of opinion. The evidence shows clearly, that the defendants were in actual and unquestioned possession, at least as early as 1789, and their possession continued until 1825, if not later, and the only doubt thrown upon the continuity of possession, arises from the testimony of a single witness, who is not entitled to credit. Upon the subject of the statute of limitations, and the effect of parol declarations to counteract it, the counsel referred to the 2nd section of the act of 1789, and cited the following cases. *Thompson* v. *Smith*, (7 *Serg. & Rawle*, 209.) *Pederick* v. *Searle*, (5 *Serg. & Rawle*, 240.) *Gregory* v. *Setter*, (1 *Dall.* 193.) *Graham* v. *Moore*, (4 *Serg. & Rawle*, 467.) *M'Kinney* v. *Leacock*, (1 *Serg. & Rawle*, 26.) *Adams on Ejectment*, by *Tillinghast*, p. 57, in note, where the cases are collected; *Jackson* v. *Shearman*, (6 *Johns.* 21.) *Jackson* v. *Davies*, (5 *Cowen*, 133.) *Jackson* v. *Kisselback*, (10 *Johns.* 338.) *Jackson* v. *Carey*, (16 *Johns.* 305.) *Rundle* v. *Etwein*, (6 *Binn.* 136.)

4. There was not in this case such a lapse of time after the application for the benefit of the insolvent laws as to authorise the presumption of the payment of Sailor's debts. Only fourteen years had elapsed from the date of the application to the bringing of the ejectment. It appeared in evidence that Sailor was indebted by specialties,

(Sailor *v.* Hertzog.)

and even judgments. In *Foulk* v. *Brown*, (2 *Watts*, 214,) Judge
SERGEANT lays down the law, that "after a lapse of *twenty* years,
bonds and other specialties, merchants' accounts, legacies, mort-
gages, judgments, and indeed all evidences of debt excepted out of
the statute, are presumed to be paid." It does not appear from the
report of the case of *Power* v. *Hollman*, (2 *Watts*, 218,) what length
of time elapsed between the discharge under the insolvent law and
the commencement of the suit; nor does it appear that there were
any specialty debts or judgments. In *Boltz* v. *Bullman*, (1 *Yeates*,
584,) it was held, that eighteen years and a half were not sufficient
to create the presumption of payment of a bond.

Mr. *H. Hubbell* and Mr. *Rawle*, for the defendants, were requested
by the Court to confine themselves to the ninth and tenth reasons
for a new trial.

1. The evidence shows that Sailor was in possession in 1792, at
least by the receipt of rent. The occupancy alleged on the other
side may have been quite consistent with this, by not being adverse,
but in the character of tenancy. It is necessary, to create the bar
of the statute, that the possession should be distinct and *hostile*. The
character of the possession, whether hostile or otherwise, may
certainly be shown by parol. Indeed, the fact of actual possession
can be proved only by parol. The same kind of evidence then,
is surely admissible, and important to negative the allegation of
hostility, by showing an admission of title.

The following cases were cited in reference to this point. *Jackson*
v. *Bard*, (4 *Johns.* 230.) *Jackson* v. *Sharp*, (9 *Johns.* 167.) *Wickham*
v. *Conklin*, (8 *Johns.* 227.) *Jackson* v. *Croy*, (12 *Johns.* 427.) *Jack-
son* v. *Parker*, (1 *Johns. Cas.* 124.) *Jackson* v. *Thomas*, (16 *Johns.*
293.) *Hawk* v. *Senseman*, (6 *Serg. & Rawle*, 21.) *Overfield* v.
*Christie*, (7 *Serg. & Rawle*, 177.) *Wallace* v. *Duffield*, (2 *Serg. &
Rawle*, 527.) *Rung* v. *Shoneberger*, (2 *Watts*, 23.) *Potts* v. *Gilbert*,
(3 *Wash. C. C. Rep.* 475.) *Davis* v. *Pierce*, (2 *Term Reps.* 53.)
*Doe* v. *Pettit*, (5 *Barn. & Ald.* 223; S. C. 7 *Eng. Com. Law Reps.*
75.) *Galloway's Lesse* v. *Ogle*, (2 *Binn.* 471.) *Jackson* v. *Cuerder*,
(2 *Johns. Cas.* 353.) *Jackson* v. *Dobbin*, (3 *Johns. Rep.* 223.)
*Jackson* v. *Scissam*, (3 *Johns. Rep.* 499.) *Jackson* v. *Davis*, (5 *Cowen*,
129.) *Jackson* v. *Shearman*, (6 *Johns.* 21.) *Graham* v. *Moon*, (4
*Serg. & Rawle*, 467.)

2. The second ground is not entitled to favour, since it is inde-
pendent of any claim on the part of the defendants, either to title or
possession. Supposing, which is quite improbable, that the Jacob
Sailor who took the benefit of the insolvent law in 1817, was the
plaintiff in this case, we contend that the jury were authorised to
presume payment of all debts, and a reassignment of the property
after the lapse of nineteen years, which had intervened from the date
of the discharge to the time of the trial. The debts were principally

(Sailor *v.* Hertzog.)

by simple contract. The dictum of Judge Huston, in *Feather's Appeal*, (1 *Penn. Rep.* 322,) that the statute of limitations does not run against debts due by an insolvent, was declared not to be law in *Shoenburger* v. *Adams*, (4 *Watts*, 430,) and in *Gest* v. *Hieskell*, (5 *Rawle*, 134,) and was finally disavowed in *Sletor* v. *Oram*, (1 *Wharton's Rep.* 106.) It is settled that after twenty years the jury are bound to presume payment of bonds and other debts not within the statute ; but within twenty years, it is a presumption of fact, dependent on circumstances, of which time is a material one. *Cope* v. *Humphreys*, (14 *Serg. & Rawle*, 15.) *Diemer* v. *Sechrist*, (1 *Penn. Rep.* 420.) *Nickle* v. *M'Farlane*, (3 *Watts*, 167.) *Foulk* v. *Brown*, (2 *Watts*, 209.) Here there were many circumstances besides lapse of time. A material fact was, that the trustees never qualified, although there was a large real estate which might have been made available for creditors, if there had been any.

Mr. *J. R. Ingersoll*, in reply.

The doctrine contended for on the other side, respecting the acknowledgment of a claim, is a very dangerous one. Even in respect to *debts* it has been very much narrowed ; and in England by a late statute an acknowledgment of indebtedness must be in writing. Parol evidence is not admissible to affect *title*, directly or indirectly, though possession may be attacked by it. In the case of *Levy* v. *The Bank of the United States*, (1 *Binn.* 27,) it was held, that an admission by the plaintiff, did not bind him in the case of personal property ; and certainly such acknowledgments ought not to have greater force in respect to real estate. If Ley had done any act, such as paying rent or accepting a conveyance, he would certainly be estopped. *Doe dem. Buller* v. *Mills*, (2 *Adolphus & Ellis*, 17 ; S. C. 29 *Eng. Com. Law Reps.* 16.) The case of *Jones* v. *Porter*, (3 *Penn. Rep.* 135,) does not go to the extent supposed. Judge Huston, there says, that the protection of the statute is not lost by declarations, that the party will yield if the adverse title proves best. In the cases cited from *Johnson's Reports*, on the other side, the declarations seem to have related to possession merely. The opinion in *Jackson* v. *Bard*, (4 *Johns.* 234,) was entirely *obiter*. The alleged declarations in this case, were produced by the contrivance of the plaintiff, and under circumstances which would induce equity to give relief against them, supposing that they were otherwise binding. They were made also, if at all, in view of a compromise; and, therefore, could not be admitted to affect the party's rights afterwards.

The Court having directed a re-argument on the questions arising upon the 9th and 10th reasons, the case was again argued at this term by the same counsel.

For the *defendant* were cited the following cases, in addition to those formerly cited : *Hull* v. *Vandegrift*, (3 *Binn.* 374.) *Law* v.

(Sailor *v.* Hertzog.)

*Merrill*, (6 *Wendell*, 277.) *Jackson* v. *Spear*, (7 *Wendell*, 401.)
*Jackson* v. *De Waltz*, (7 *Johns. Rep.* 157.) *Jackson* v. *Walker*, (7
*Cowen*, 637.) *Brant* v. *Cuyler*, (10 *Johns.* 358.) *Morse* v. *Hitchcock*,
(4 *Wendell*, 492.) *Jackson* v. *Cole*, (4 *Cowen*, 587.) *Jackson* v.
*Dennis*, (4 *Wendell*, 558.) *Jackson* v. *Harder*, (4 *Johns.* 202.)
12 *Wendell*, 105. *Daniel* v. *Ellis*, (1 *Marsh. Kentucky Rep.* 60.)

For the *plaintiff*, were cited, in addition, *Brandt* v. *Ogden*,
(1 *Johns. Rep.* 158.) *Jackson* v. *Waters*, (12 *Johns.* 358.) *Smith*
v. *Bayley*, (9 *Johns.* 180.) *Jackson* v. *Parker*, (1 *Johns. Cas.*
124.) *M'Masters* v. *Bell*, (2 *Penn. Rep.* 180.) *Read* v. *Dickey*,
(1 *Watts*, 152.) *Walker* v. *Walker*, (16 *Serg. & Rawle*, 379.)
*Miller* v. *Kean*, (5 *Watts*, 348.) *Comegys* v. *Carlin*, (3 *Watts*, 280.)
*Mercer* v. *Watson*, (1 *Watts*, 330.) *Royer* v. *Benlow*, (10 *Serg. &
Rawle*, 303.) *Davis* v. *Pearce*, (2 *Term Rep.* 53.) *Jackson* v. *Eyre*,
(14 *Johns.* 224.) *Wells* v. *Prince*, (4 *Mass. Rep.* 67.)

The opinion of the Court was delivered by

Kennedy, J.—On the trial of this cause at Nisi Prius, several
questions of law were raised and discussed by the counsel con-
cerned; upon which it became necessary for the learned judge,
before whom the cause was tried, to instruct the jury. His instruc-
tion to the jury on these questions has been excepted to by the
counsel for the defendants, and, among other matters, assigned by
them as reasons for a new trial. After a very full and elaborate
discussion of them by the counsel on both sides, and a deliberate
consideration of them on our part, we are well satisfied that they
were correctly answered by the judge in his charge to the jury.
The principles connected with and governing the solution of them,
are stated with great clearness and precision by him, and applied
with a degree of force and aptness that would seem to render the
more clear and perfect demonstration of them unnecessary, if not
vain: it will not therefore be attempted. But we think the verdict
is decidedly against the weight of the evidence given on the trial of
the cause, if not wholly and entirely so, and more especially as
regards the nature of the possession and the duration of time, which
the defendants and those under whom they claimed the right of
property, as well as that of the possession, to the lot of ground in
question, actually had and held it. It appears to us clear, from the
evidence on the part of the defendants, that their possession, which
is admitted now to exist, and that of those from whom they derive
their right to it, cannot be considered other than adverse to the
plaintiff's claim, from its commencement; and that it has so con-
tinued down to the present time, even admitting the evidence given
on the part of the plaintiff, and all that can be fairly drawn from it,

(Sailor v. Hertzog.)

to be true.   Also, that the evidence on the part of the defendants shows beyond all reasonable doubt, that their continuous possession had endured much more than twenty-one years before this action was commenced ; and was therefore protected against the plaintiff's claim by the statute of limitations.   Both parties derive their respective claims to the lot by deeds of conveyance from George Weiss. The plaintiff's appears to be the first in point of time, both as to its execution and being put on record, and therefore was, without doubt, at one time the only valid one of the two.   Whether, however, the plaintiff or Jacob Sailor, his grantor, and the immediate grantee of George Weiss, ever took the actual possession of the lot at all, is very questionable from the evidence.   It does not appear to have ever been assessed with taxes at any time in the name of Jacob Sailor, either as the owner or occupant of it.   He obtained the title to it by a deed of conveyance from George Weiss on the 5th of July, 1788. Had he taken the actual possession of it, either by himself or his tenants immediately, or shortly after, and kept it even for the space of two or three years, it might naturally be supposed that the assessor would have come to a knowledge of it, and of course, as it was his duty, would have made a return of it in Sailor's name accordingly ; nothing, however, of the kind appears.   But it does appear that Jacob Peters, son and one of the executors of John Peters, to whom, with the other executors, the lot was devised to be sold, his father, the testator having purchased and obtained a deed of conveyance for it, on the 16th of February, 1789, from Jacob Ettwein, who, on the 2d of that same month, purchased and obtained a deed of conveyance for it from William Henderson, who, on the 19th of the preceding month, purchased and obtained a deed of conveyance for it from George Weiss, who had, on the 5th of July preceding, as has been mentioned, conveyed it to Jacob Sailor, was assessed as the owner of a lot answering the location of the lot in question in the year 1791, the second year after his father purchased it, and in the same year, as it would seem, of his death ; and so it appears to have been assessed every succeeding year till 1798, when it was assessed as the estate of George Peters, another son and executor of John Peters, in whose name it continued to be assessed till 1805, when it was assessed in the names of Ley and Hupfeldt, who, as it may be inferred very fairly from the evidence, came into the possession as the tenants of Joseph Peters, who purchased of the executors of John Peters in April 1800 ; and it continued to be assessed to Ley and Hupfeldt till 1808, when, in addition to their names, Joseph Peters is superadded as the owner of the estate ; and thus it continued till 1811, when the name of Hupfeldt is dropped, and the assessment made in the name of Daniel Ley alone, who, previously to that, in November 1809, had purchased the lot of Joseph Peters ; so that from 1791, it was regularly assessed, as it would seem by the evidence, to some one or other of the Peters family, and those to whom

(Sailor *v.* Hertzog.)

it was transferred by them, down to the present time. This taken in connection with the verbal testimony given by the witnesses on behalf of the defendants, seems to establish very clearly that actual possession of the lot was taken by the Peters family, at least, as early as 1790 or 1791. First, the testimony of Conrad Wile says, that he removed opposite to the lot in 1793; that the Peters family occupied it at that time; he thinks they occupied the bake-house as such, though he does not recollect it distinctly; Jacob Peters died, he thinks, of the fever in 1793; that after his death, a man of the name of Stammers, occupied it; he was a baker and followed that business; but he cannot tell how long he continued to occupy it, nor under whom he held it, though they were intimate acquaintances. But as several of the witnesses think that the Peters family had occupied shortly before, and as they lived, according to the evidence without doubt or contradiction, in a house on the adjoining lot, there being then no dwelling-house on it, the natural, if not the necessary presumption is, that Stammers took possession under the Peters family. For it is not to be believed, unless there were direct and positive proof of the fact, that they, considering themselves to be, as we are bound to suppose from the evidence, the undisputed owners of the lot, and having it close by their residence, constantly under their eye, would have permitted Stammers or any other to have taken possession of and to have occupied it, without it were taken under them. Nor, indeed, is it probable, seeing that they were then considered and reputed by every one in the neighbourhood to be owners of it, that Stammers or any one, excepting Jacob Sailor, would have attempted to take possession without their consent. John Greiner also testified, that John Peters was in possession of it before his death, which must have been, at least, as early as 1791, and that he was succeeded by his son Jacob, who died of the fever in 1793. He thinks that it was untenanted anterior to and after the death of Jacob Peters, before the occupancy of Ley commenced. According to the testimony of Edward Penington, Daniel Ley went into the possession of the sugar-house on the lot in dispute, either in the year 1800 or 1801. And John Maybin, a son-in-law of John Peters, and also one of his executors, though he could not testify to the year that the Peters first took possession of the lot, yet he knew they were in possession of it in 1793; that they kept possession of it until the executors of John Peters, of whom he was one, sold it at a public sale to Joseph Peters; which, according to the deed of conveyance made by them, was in October 1804. Joseph Peters, as he testifies, was the youngest son of John Peters; that he took the possession and held it by himself or his tenant, as he believes, until he sold it to Ley and Hupfeldt. He believes Ley and Hupfeldt were the first who made a sugar-house of it. He also testifies that he understood that George Peters rented it first to Ley. None of these witnesses, though they resided in the immediate neigh-

(Sailor v. Hertzog.)

bourhood of the lot, ever heard of Jacob Sailor being the owner of or of his having any claim to it, until about the time this action was brought.    They all understood and believed that the Peters were the owners of it; which goes strongly to support and confirm the fact, that no possession was ever had of it from the time John Peters obtained his deed of conveyance for it, down to the commencement of this action, that was not taken and held under the Peters claim. Catherine Craigen or Hanson, a sister of Jacob Sailor, and witness produced on the part of the plaintiff, is the only person who has even given a single spark of evidence to the contrary.   She testifies that she knew her husband had received rent for Jacob Sailor, meaning for the lot in question, and sent it to him in the country.   The last time he received rent, according to her recollection, was in 1797 : and he stopped receiving it at that time on account of the sickness. She knows it was rent for this property, because her husband always received rent and sent it to Jacob Sailor in the country, who lived then beyond the blue mountain.   After the sickness she went with her husband to the sugar-house, when they found strangers in the possession of it.   Then her husband looked after the rent no longer, but sent word to Jacob Sailor to come down himself; that he accordingly came, and found strangers in the possession of it.   But she does not know the name of any tenant of whom rent was received by her husband; nor does it appear that she ever saw any paid, at least she has not said so.   She says, the first she knew of the property, was after her brother bought it, before the sickness of 1793. Then there was a bake-house on it, but she cannot tell whether it was frame or brick, or how many stories it was high, though she was in it several times; and her brother wanted her and her husband to live in it.   That the tenants left it in 1797, on account of the sickness, and did not return, though she can tell nothing about them, nor who they were, not even the name of any one; nor does she state how she knew, whoever they might be, that they were tenants to her brother.   Her testimony is very questionable, if not wholly incredible; for in 1825, she gave it in the form of a deposition, without testifying to any of the matters as mentioned above, and testified to by her on the trial at Nisi Prius.   Instead of saying that the first she knew of the property, was after her brother Jacob *purchased,* as she did on the trial at Nisi Prius, she in her deposition says, that as late as 1815, *she then thought the sugar-house belonged to her deceased sister,* to whom her brother Jacob was executor, and that her *sister had left it to herself, her brother Jacob, and a surviving sister.*   She also states in her deposition, that at the same time she thought so, she went in company with her son-in-law, Isaac Young, to Daniel Ley, who was then in the possession of the sugar-house, to see if it belonged to him or not.   That *she asked* Ley, if it belonged to her brother, or no; Mr. Ley said he had bought it, but she could not recollect of whom he said he bought it : that he showed *her the deed*

*and other papers;* and said they could not give him a good title, and he would not pay them any more money. In her deposition she gives her narrative plainly in such a way, as to make it be believed, that *she,* not Isaac Young, called upon Ley, and that *she alone* had all the conversation with Ley relative to the sugar-house, that took place upon that occasion: in short, that Isaac Young did not even speak a single word to Ley then about it; but merely accompanied her to Ley's that *she* might see and talk to Ley in regard to it. According, however, to the relation given by her on the trial at Nisi Prius, she expressly and directly contradicts all this, and says that she went thither because Isaac Young took her; that *he* went thither, after he got a power from Jacob Sailor, her brother, to look after the property; that she *did not go thither to see if she had any claim to the property,* because *she knew she had none;* that *she went to see a friend on the Germantown road, while Young looked at the papers,* which Ley *showed him;* that he showed *him, not her,* all his papers, bonds and every thing; and she does not testify that *she* spoke as much as one single word to Ley about the sugar-house or the property, but that Young said all to Ley that was spoken to him in relation to it. In her testimony to the arbitrators on the 11th of October, 1827, instead of *going to see a friend while Young was looking at the papers* shown to him by Ley, she said she went out and *held the horse* that they used in coming thither, as it was wild. Again, in her deposition she says nothing about either her brother having received rent for the sugar-house at any time, or her husband for him. The first time she testified to rent having been received, was on the trial of the cause before the arbitrators, when she said, " my husband had the care of it, and *to the best of my knowledge* got some money for *rent,*" (without stating from whom,) " and sent it to my brother; and then the sickness came on." Before the arbitrators, she also said, she went to Ley's with Young, who went thither to get *rent,* that Young *claimed rent for the sugar-house;* yet Young does not testify that he made any such claim. Thus it is seen that the several narratives given by her at different times of the interview with Ley, and relative to the property in question generally, form a tissue of contradiction, which cannot possibly be reconciled. The fact then of Jacob Sailor's having received rent, either directly or indirectly, for or on account of the sugar-house, standing entirely upon the evidence of Catharine Craigen or Hanson, for its support, cannot with any propriety be said to have been proved. Besides the facts established by the written evidence, which is not, and, as I apprehend, cannot be contradicted or impugned, to wit, that the property was returned by the assessor as the estate of John Peters, as early as the year 1791, and continued to be assessed with taxes in the names of several of the Peters family, as the estate of one or other of them, until they passed it away to strangers, together with the acts of ownership exercised by them over it in

making sales thereof, both public and private, go strongly to disprove all that Mrs. Hanson has said in regard to the rent being received by her husband for her brother, or by her brother himself; and to prove at the same time, that the Peters family asserted their claim to the sugar-house, and the lot upon which it stood, and as it were kept it up by a continual claim, by means whereof, as also by their having occupied the same either themselves personally or by their tenants, they acquired the reputation of being notoriously the owners thereof, while Jacob Sailor was wholly unknown as ever having a claim thereto: but this could not well have been the case, had he ever been in the actual possession of the property, either himself in person, or by his tenants, as his sister has testified.

This written evidence just noticed, while it goes to impugn the testimony of Mrs. Hanson, and taken with itself, to render it altogether unworthy of credit, strongly tends to support and strengthen the parol evidence given on the part of the defendants, of the early and long-continued possession of the property having been actually taken and kept by the defendants and those under whom they claim: so that there is really no room left to doubt that they took and have had the actual adverse, entire, distinct and obvious possession of the premises in question, for a much longer period than that required by the statute of limitations, not only to protect them in their present possession, but to enable them to recover it in ejectment if they should be expelled.

But it has been contended and urged strenuously by the counsel for the plaintiff, that, even admitting the possession of those under whom the defendants claim, to have been originally adverse, yet the testimony of Catharine Craigen, Isaac Young and Henry Kalback, proves clearly, that it became otherwise in the year 1815, before the statute of limitations had fully run. That from their evidence the jury were warranted in finding that Daniel Ley, then in the actual possession, consented and agreed to hold under Jacob Sailor, from that time forward. Although I think the evidence of the defendants was abundantly sufficient to show that the statute of limitations had run before 1815, yet supposing it was not, we are of opinion that the testimony of Catherine Craigen, Isaac Young, and Henry Kalback, or that of any other witness produced on the trial, does not go to prove any consent given, or agreement made by Daniel Ley, that he would give up all claim of right to the property and the possession of it, and thenceforward hold the possession thereof under Jacob Sailor. The utmost that can be fairly deduced, from all that these witnesses testify to, that he either said or did, is, that he was willing to compromise, and to give something in order to extinguish Sailor's claim; though I am far from thinking that much credit ought to be attached to their evidence, even if it were material to the matter in issue between the parties, on account of the discrepency in the several narratives given by the two first at different times, and the bad character of

(Sailor *v.* Hertzog.)

the third as to truth. Mrs. Craigen, who had, according to her deposition, all the conversation herself with Ley in 1815, when she went to his house in company with her son-in-law, Isaac Young, does not state that any thing was then said by Ley about his being willing to lease of Sailor or to purchase of him, or even to compromise; but merely says, that he *told her*, that he had bought the sugar-house, but the person of whom he bought could not give him a good title, and he did not mean therefore, to pay him the rest of the purchase-money. She, however, afterwards in her evidence before the arbitrators, transposes herself and Young; and instead of testifying as she did in her deposition, that she went accompanied by Young, to see Daniel Ley, and to speak to him concerning the property, and that she did do so, she testified that Young being the agent of her brother, went to see Ley, to get rent of him for the sugar-house, and that she went along; that Young told Ley he *had come for rent* for Jacob Sailor; to which Ley replied that he hoped he would not distress him; that he had bought the property, and would pay no more money, because the title of Jacob Sailor was clear; requested Young to send for Sailor and he would *try* and *compromise if he could*. Young *claimed* rent for the bake-house in Sterling alley. Mr. Ley said nobody had a clear title but Jacob, and he should pay no more money till he got the title of Mr. Sailor: he would *try and compromise* with Mr. Sailor. Young got no rent, but Ley told him to send for Jacob Sailor, (who, as she testified, was then over the mountains, and had been gone a good while, though according to Young's testimony at Nisi Prius, it would seem, he was in or about this city,) and *he would try and compromise with him.* On the trial at Nisi Prius she testified, that in 1815 she went with Young to Ley's: that Young said to Ley, "we have come to look after the property of Sailor, for you must do something about the property; you must pay rent, or buy it, or do something; if you don't I must commence a law-suit against you." Ley replied, "I will not pay any more money to any body, for I find the property is Jacob Sailor's: I hope you won't distress me: send for Sailor, and I will buy it of him, or compromise with him; for I find there is no other title than Jacob Sailor's; and I will pay no money to Peterman." But at no time does she testify, that Ley said he would take a lease of Sailor, or *pay rent* to him for the property; but simply that he believed Sailor had the only good title there was for it; and therefore he would pay no more money on his purchase of it; that he would *buy* or *compromise if he could*, with Sailor, if Young would send for him, so that he could see Sailor himself: from which, —even giving credit to what it is difficult if not impossible to believe,—when taken altogether, the most that can be inferred is, that Ley being induced from what was said and shown to him, to think that Sailor's title might be the best, was willing to *compromise* with Sailor by giving him something for it, *if they could agree*: but

(Sailor v. Hertzog.)

certainly not that he was willing to surrender the possession of the property to Sailor, or to become his tenant, or to hold the possession of it under him, upon any terms. So that, admitting all that Mrs. Craigen or Hanson has said to be true, she proves nothing which in its effect could have terminated the running of the statute of limitations.

The testimony of Isaac Young is relied on also, to show that, although the possession of Ley was adverse anterior to 1815, yet it then became otherwise by his agreement. It is therefore proper to recur to it in order that we may see to what extent it goes in this respect. He testifies as follows: "Jacob Sailor in 1815 requested me to look after his property; gave me a power of attorney for that purpose. After getting a copy of the deed of conveyance to Sailor for the property, I called on Ley, at his residence in Sixth street above Cadwallader street, asked him if he possessed the bake-house in Stirling alley: he said he did. I told him I called to inform him that that property belonged to Jacob Sailor, and that I was his agent, and had come to demand it. I showed him the power of attorney and the *original* deed. He produced his writings to show me that he had purchased the property of Peterman or Peterson, though not quite sure of the name. He said he had not paid the whole of the purchase money; and he would pay no more to Peterman: said he was satisfied the property belonged to Jacob Sailor, that he had the right title. I told him something must be done, or I should have to bring a suit against him. He said he hoped I had not come to distress him: I told him it was not my intention to distress him; I was willing to *compromise* on the most amicable terms. He then requested me to send Sailor to him, and he would purchase the property of him, or *pay him rent*. Nothing further was said then. I informed Jacob Sailor of it, and he asked me to meet him at Fouquet's, corner of Tenth and Cherry streets." This witness states further, that Sailor and Ley had a meeting afterwards in December of that year, 1815, at Fouquet's, when the one offered to sell for a certain sum of money, and the other to purchase at a much less sum: that they came to no agreement of purchase or compromise; nor does it appear that any thing was said about paying rent for the property; and they separated, as it would seem, without even coming to any agreement to have any further meeting about the matter in dispute; at least the witness heard of none. Now from the evidence of Young, supposing it to be true, which, however, there is some reason to doubt, it is manifest that nothing was ever agreed on, except to have a meeting between Sailor and Ley at Fouquet's, with a view to effect a *compromise*, if they could. Young, it would seem, according to his evidence, first proposed to compromise the matter himself, on behalf of Sailor, with Ley, but Ley declined this, and requested that he should send Sailor himself to him, and he would purchase of him, or *pay him rent*. The plain import of which was, that he was willing to do the one or

the other, provided they could agree first upon the terms, but certainly not either, without an agreement could be made between them, regulating the terms and conditions upon which either the one or the other should be done.   But unless this could be accomplished, the inevitable conclusion was, that they were to remain, in regard to the property, as they stood before any thing passed between them in relation to it.   Subsequently, according to what was agreed on at the interview between Young and Ley, a meeting took place at Fouquet's, between Sailor and Ley, at which Young was present, as he says, but they separated without coming to any accord whatever, as it would appear, on the subject; consequently their relation to each other could not be changed, nor in any respect be regarded as different from what it was, anterior to Young's first calling upon Ley and making known to him Sailor's title to the property.   The statute of limitations therefore was left to run its course, which was terminated before the commencement of this action, long enough to put an end to all claim on the part of the plaintiff.

But, as I said before, there is great reason to distrust the accuracy of Young's testimony, as given by him on the trial of the cause at Nisi Prius; because in a deposition given by him on the 17th of February, 1826, he does not say a word of his having a power of attorney from Jacob Sailor, but merely says, that as his agent, he called upon Ley in 1815, who was then in possession of certain premises in Sterling alley, the property described in the declaration, (meaning the declaration or description of the property filed and claimed in this action,) when Ley stated to him he believed the plaintiff had the oldest title to the premises, and that *he Ley would call and see him,* instead of requesting Young, as he testified at Nisi Prius, *to send Sailor to him,* that he might see him.   Neither does he, in his deposition, say a scintilla of Ley's ever proposing to purchase or to *pay rent* or make a compromise.   But he states one thing in his deposition, which he has never testified to since, that Ley said *he knew of Sailor's title at the time that he* (Ley) *purchased.*   In his testimony before the arbitrators on the 13th of October, 1827, he says " in October, 1815, I waited on Ley, to know what he was willing to do, to compromise, or stand a law-suit, or *pay rent.*   Ley then stated that he was *willing to compromise ;* that he had purchased the property and paid part of the money, but he found they would not give him a good title, and he would pay no more.   He stated also, that he believed the old man, Jacob Sailor, had the right title. He *promised me he would make it his business to try to see Jacob Sailor in order to compromise ;* he said he was willing to buy the property of Jacob Sailor *if he could make him a title.*"   But he does not testify that Ley said he would or was willing *to pay rent* to Sailor upon any terms whatever.   So that *he would seem* to have aimed at improving his testimony for the plaintiff at Nisi Prius, as to Ley's

(Sailor *v.* Hertzog.)

saying he would pay rent if they could agree. But still, supposing all to be true that he has testified to, it only goes to prove that Ley was willing to make a compromise and to pay something in order to obtain it, that he might avoid a lawsuit and hold the property in peace ; but clearly, not to prove that he was willing to give it up to Sailor unconditionally, and to hold the possession thereof under him. Young also testifies to Sailor and Ley's having an interview, but says, in his deposition, *he cannot recollect what took place :* but in his evidence afterwards before the arbitrators he says, they met at Fouquet's, where he stated to Ley, that he came with Sailor to *compromise* about the property in Stirling alley, whereupon Ley said to Jacob, ' have you made up your mind to comply with my offer ?' Jacob said no ; my nephew says you have not offered me enough. Ley replied, he thought he had made him a generous offer." Then, as the witness says, he left them together, and could not say what took place afterwards. Thus it is evident these two witnesses, Craigen and Young, for the plaintiff, are inconsistent both with themselves and with each other. But giving full credit to all that they have said, it only goes to show an attempt made to effect a compromise, which failed entirely.

The only remaining testimony given on the part of the plaintiff, that has been mentioned as having any bearing on this part of the case, is that of Henry Kalback. It, however, only goes to prove that Ley was in the actual possession and occupation of the property more than twenty years before the trial of the cause at Nisi Prius, when he went first with Jacob Sailor to the property in Sterling alley, where they saw Ley, to whom Sailor presented *some deeds,* saying the property was his. Ley was a little started ; said he *bought the property ;* did not care much about him, and seemed to be a little angry. Sailor told Ley that if he did not settle with him in friendship, he must take the law. Ley said he would consider of it, and perhaps they could settle it. About two years after that, the witness went with Sailor again to Ley, when Sailor asked a thousand dollars of Ley for his right to the property, and Ley offered two hundred ; when they parted, without coming to any agreement. Ley afterwards authorised the witness to offer Sailor five hundred dollars. Long after that Sailor called a third time on the witness, to go with him to Ley, when he did so ; but Ley was busy then, and they agreed to meet each other on a subsequent day at Fouquet's. They accordingly did so, but could not settle ; and parted, as it would seem, without making any further appointment for meeting again, on the subject. Admitting all that Kalback has said to be true, it would seem to be impossible that any conclusion should be drawn from it, that Ley had ever yielded any thing whatever to Sailor, but that they parted finally, in regard to the property, as they first met, each retaining his position and his right whatever it was. There is therefore no pretence for saying that Kalback's evidence tended to esta-

blish any thing which could prevent the statute of limitations from running in favour of the defendants. Under this view of his testimony, it is scarcely necessary to observe, that even if it had tended to prove any thing that would have prevented the statute from operating, the jury, from his general bad character for truth, as it appeared in evidence to them, ought to have disregarded his evidence.

That Daniel Ley, as well as those under whom he claimed the right of possession of the lot of ground in question, was in the actual possession of it for many years, claiming and using it as the true and absolute owner thereof, cannot be doubted from the evidence. They even sold and transferred the fee simple estate in it several times; which may be regarded as the highest possible acts of ownership that could well be exercised over such property; thereby showing to demonstration, as it were, that they claimed and held it, not only adversely to Jacob Sailor, but to all the rest of the world. Then under such circumstances, supposing it to be true, that Ley was called on by Jacob Sailor or his agent, and after being made acquainted with Sailor's title to the property, had said, "I have bought and paid part of the purchase-money for it, but finding, as I have now some reason to believe, that Sailor's title is the best or the only good title to it, I am willing to compromise, to buy and give something, or to rent, provided Jacob Sailor and I can agree; and I will make it my business to see him, so that we may try to come to some agreement on the subject;" and accordingly Ley afterwards had seen Sailor, when it was agreed that they should meet on a certain day at a certain place, for the special purpose of endeavouring to make some arrangement for settling the matter amicably between them; that in pursuance thereof, they had met each other; and after treating for a compromise, but finding that they could make none, they had parted without even agreeing to have any further meeting on the subject, what would all this have amounted to? If it were to be held equivalent to an agreement on the part of Ley to give up the *adverse* character of the possession, which he had held so long previously, and that thereafter he would hold under Sailor, it would be most singular, if not infinitely worse, because it would be imposing upon him the effect of an agreement which the parties never endeavoured to make, or if they did, they failed to accomplish. To establish such a principle, would not only tend necessarily to prevent all attempt to compromise or adjust amicably differences, arising between men, but likewise, to divest them of their rights, as if they had bound themselves by their agreement to do so. At the very utmost, therefore, all that was said or done by Ley, can only be considered as an overture to a compromise between him and Sailor. This, however, according to all the evidence even on the part of the plaintiff, they were unable to effect: consequently all that passed between them goes for nothing. This

(Sailor v. Hertzog.)

conclusion is sustained by the subsequent conduct of the parties; for. after the last meeting that we hear of between them, Ley is suffered by Sailor to remain in the possession as before, until he sells and disposes of the lot as his own; and those claiming under him remain afterwards, for a period of fifteen or eighteen years, without claim to rent for the lot, or for the lot itself being made by Sailor; which is wholly incompatible with the idea having been entertained by either Sailor or Ley, that the relationship of landlord and tenant had been created between them, from any thing that had passed or taken place.    It seems, therefore, that there is no just ground for stripping Ley of the *adverse* possession which he most unquestionably had at first, of the lot.    Unless the acknowledgment of title, by the tenant in possession, who has been in previously, holding it as the absolute owner, or adversely under any circumstances, be made in such manner as to show that he intends to hold the possession no longer adversely, but in future under the party making the claim of right to the land against him, and so as to induce the latter to believe that he will so hold it, there is no reason why the statute of limitations should not continue to run its course as it was doing before.

Without such an acknowledgment, the real owner, or party claiming the land as such, if he lies by until the twenty-one years have run, and then the tenant in possession sets up the statute as a bar to his subsequent claim, has no just ground to complain that he was deceived, by any thing that the tenant in possession, either said or did.    The tenant is not chargeable with having practised any deception; or with having even attempted to induce a belief that he would in future hold the land otherwise than he had done before: and much less can he be said to have violated any engagement, either express or implied in respect to holding the possession for or under the party claiming adversely to him, because he cannot be said to have made any engagement of the kind.

Then admitting every thing to have passed between Sailor and Ley, which the evidence has any tendency to prove, it is impossible fairly to come to the conclusion, that Ley was willing to make an unconditional surrender of his *adverse* possession; or that without some specific agreement being first made between him and Sailor for that purpose, he was willing to hold under Sailor, or to relinquish the claim purchased by him to the lot, and under which he then held possession of it.    For had this not been the understanding of both parties, there was no use in their meeting, as they did, with a view to make such agreement if they could: but having met according to appointment and broken up without coming to any such agreement as had been mentioned between them, each had every reason to believe that he stood in his original position and upon his original rights.    The design of the legislature, in passing the statute of limitations, is not to be frustrated by putting a construction upon what passed between the parties, different from their

(Sailor *v.* Hertzog.)

understanding of it.    The statute itself is a wise one, and entitled to a favourable construction as also operation.    It is founded upon principles not only of public policy, but of natural justice, which the experience of almost every civilized country has fully approved. The natural effect of it, is to promote the peace and quiet of the community; and at the same time, to advance greatly the prosperity of it, by giving repose and protection to all, who have been in the actual possession and enjoyment of lands, using them as their own for a period of twenty-one years: so that after that, where they had any doubt of the goodness of their titles thereto before, they may have none, but go on with confidence to improve and render them more valuable; and thereby increase their own wealth and strength as also that of the state.    It is by the proper application of this statute that men, in many instances, are made secure in the enjoyment of their property, which, it may be truly said, in the wild and uncultivated parts of the state, they have bought not merely by the sweat of their brow, but with their blood as well as their money.    It being then, as was said by the Court in *Green* v. *Brivett*, (2 *Salk.* 422,) a statute on which the security of all men depends, it is to be favoured. *Thompson* v. *Smith*, (7 *Serg & Rawle*, 209.)    And therefore twenty-one years adverse possession of land, by a party, will give him a good title to it, upon which he may either recover or defend in ejectment. *Stokes* v. *Berry*, (2 *Salk.* 420 ; S. C. *Ld. Raym.* 741 ; *Holt*, 264; 1 *Mod.* 287.) *Smith* v. *Tyndal*, (2 *Salk.* 685.) *Frederick* v. *Searle*, (5 *Serg. & Rawle*, 240.)

The verdict must be set aside and a new trial granted.

Rule absolute.